SBK:WMN
F#2004R02139

M-07-501

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   -against-

ROBERT VILLANUEVA and
EPIFANIO VILLANUEVA,

               Defendants.

- - - - - - - - - - - - - - - - X

**FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF APPLICATION
FOR ARREST WARRANT

(T. 18 U.S.C. § 371)

EASTERN DISTRICT OF NEW YORK, SS:

      MARCUS WILSON, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

      Upon information and belief, on or about and between January 1, 2001 and June 18, 2004, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ROBERT VILLANUEVA and EPIFANIO VILLANUEVA, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud Starrett City Incorporated ("Starrett City") and Grenadier Realty Corporation ("Grenadier") and to obtain money and property from Starrett City and Grenadier by means of materially false and fraudulent pretenses, representations, and promises and for the purpose of executing and attempting to execute such scheme and artifice, to cause certain mail matter, to wit: payment checks, to be

delivered from Brooklyn, New York to Chicago, Illinois by a commercial interstate carrier, to wit: Federal Express Corporation, in violation of Title 18, United States Code, Section 1341.

(Title 18 United States Code, Section 371)

The source of your deponent's information and the grounds for his belief are as follows[1]:

1. I have been a Special Agent with the FBI for approximately 3 years. My information comes from reviewing documents, including bank records and reports from witness interviews, and debriefings of confidential sources and cooperating witnesses who have pled guilty to federal criminal charges.

### Background

2. In or about spring of 2004, an individual associated with Starrett City, a residential housing complex in Brooklyn, New York, noticed a high volume of insurance claims filed against Starrett City. An internal investigation was undertaken by Grenadier, the management company for Starrett City. During the course of the investigation, Grenadier discovered that one of its employees in the claims department had processed an unusually high volume of insurance claim vouchers.

---

[1] Because the purpose of this affidavit is merely to set forth probable cause to arrest, I have not indicated all of the facts and circumstances of which I am aware.

3

3. In June 2004, an attorney for Grenadier and an attorney for Starrett City questioned this employee, who later became a cooperating witness ("CW1"). During this interview, CW1 admitted to having submitted numerous falsified insurance claim vouchers and using the payments issued by Starrett City for those falsified vouchers for his/her own personal use. In addition, CW1 confessed that he/she did not perpetrate this scheme alone. In subsequent interviews, CW1 admitted that certain other individuals, including the defendants ROBERT VILLANUEVA and EPIFANIO VILLANUEVA, were also involved in the fraudulent scheme and had received payments as a result of their participation in the scheme. In September 2005, FBI Special Agent Paul Fracassini met with CW1 and he/she confirmed the operation of the scheme and the participation of the defendants ROBERT VILLANUEVA and EPIFANIO VILLANUEVA.

### The Fraudulent Scheme

4. CW1 stated, in sum and in substance, that he/she created false claim paperwork for fictitious claimants and provided this false paperwork to the accounts payable department of Starrett City. Specifically, CW1 explained, in sum and in substance, that he/she typically created the false paperwork by photocopying and altering authentic documents that had previously been submitted for legitimate claims. Based on the false paperwork prepared by CW1, Starrett City issued settlement checks

to the fictitious claimants and provided these checks to CW1 for delivery to the supposed claimants.

5. CW1 stated, in sum and in substance, that he/she negotiated the settlement checks that he/she received as part of the scheme in several different ways. CW1 stated, in sum and in substance, that in some cases he/she deposited the checks into his/her own bank account by double-endorsing the checks, i.e., forging the supposed claimant's signature and signing CW1's own name on the back of the check immediately below the supposed claimant. CW1 also stated, in sum and in substance, that in some cases he/she personally cashed the settlement checks by double-endorsing them, as described in the previous sentence, but asking the bank teller to give him/her cash rather than depositing the check into his/her account.

**The Roles of Defendants
Robert Villanueva and Epifano Villanueva in the Fraudulent Scheme**

6. CW1 also admitted that, in or about and between 2001 and 2004, CW1 submitted fraudulent claims in the names of real people who were not legitimate claimants. CW1 stated, in sum and in substance, that the names of those people were often supplied to CW1 by the defendants ROBERT VILLANUEVA and EPIFANIO VILLANUEVA. CW1 would process fraudulent claims in the names of those people using the same method as described above, except that once a settlement check was issued in the fraudulent claimant's name, CW1 gave or mailed the check to the defendants

ROBERT VILLANUEVA and EPIFANIO VILLANUEVA. The defendants ROBERT VILLANUEVA and EPIFANIO VILLANUEVA then would give the settlement check to the named claimant, who in turn would endorse and deposit the check. Once the check cleared, the claimant would remit a majority of the proceeds of the settlement check to CW1, defendant ROBERT VILLANUEVA and defendant EPIFANIO VILLANUEVA, while keeping a small portion of the settlement check as payment for providing a bank account and name.

7. In or about August 2006, I interviewed cooperating witness 2 ("CW2"). CW2 stated, in sum and in substance, that defendant ROBERT VILLANUEVA approached him/her with a money-making proposition. CW2 stated, in sum and in substance, that defendant ROBERT VILLANUEVA instructed CW2 to open a bank account, sign several blank starter checks, and then give the signed blank checks and other bank account information to the defendant ROBERT VILLANUEVA. CW2 stated, in sum and in substance, that he/she agreed to the plan and did as the defendant ROBERT VILLANUEVA instructed. CW2 stated, in sum and in substance, that the defendant ROBERT VILLANUEVA subsequently brought him/her a Starrett City settlement check that was made payable to CW2 and instructed him/her to endorse the back of that check. CW2 stated, in sum and in substance, that he/she again did as the defendant ROBERT VILLANUEVA instructed and that he/she

was paid approximately $1,000 for his/her participation in this plan.

8. CW2's statements are corroborated by banking records. Banking records show that in or about July 2003, a $30,000 settlement check issued by Starrett City and made payable to CW2 was deposited into CW2's bank account, which had just recently been opened. Based on my training, experience and knowledge of the investigation, I believe this was the settlement check that defendant ROBERT VILLANUEVA provided to CW2 and that CW2 endorsed. Records also show that, several days after this Starrett City check was deposited into CW2's bank account, approximately six checks signed by CW2 and made payable either to CW1, defendant ROBERT VILLANUEVA or defendant EPIFANIO VILLANUEVA were disbursed by CW2's bank. Records show that, through these six checks, CW2's bank disbursed approximately $10,500 to CW1, approximately $7,000 to defendant ROBERT VILLANUEVA, and approximately $11,000 to defendant EPIFANIO VILLANUEVA. These six checks corroborate CW2's statements that he/she provided signed blank starter checks to defendant ROBERT VILLANUEVA after he/she opened the bank account.

9. CW2 stated, in sum and in substance, that defendant ROBERT VILLANUEVA later told him/her that he/she could make additional money by recruiting others to similarly open bank accounts. CW2 stated, in sum and in substance, that he/she then

7

recruited three other individuals, specifically Co-conspirators A, B, and C (respectively "CCA," "CCB" and "CCC"), to similarly open bank accounts and turn over signed blank starter checks and other account information. CW2 stated, in sum and in substance, that he/she was paid for every individual he/she recruited.

10. Again, banking records corroborate CW2's statements. Banking records for accounts in the names of CCA, CCB, and CCC show a movement of funds similar to that of CW2's bank account. Specifically, a Starrett City settlement check is deposited into an account and then several checks payable to CW1, defendant ROBERT VILLANUEVA and defendant EPIFANIO VILLANUEVA -- totaling almost the entire amount of the settlement check -- are drawn on that account. In addition, one check payable to CW2 is drawn on the account for a sum much less than that disbursed to CW1, defendant ROBERT VILLANUEVA and defendant EPIFANIO VILLANUEVA, corroborating CW2's statement that he/she recruited CCA, CCB, and CCC.

11. Banking records show that in or about January 2004, a $25,000 check issued by Starrett City and made payable to CCA was deposited into CCA's bank account. Records also show that, several days after this Starrett City check was deposited into CCA's bank account, approximately five checks signed by CCA and made payable to CW1, CW2, defendant ROBERT VILLANUEVA and defendant EPIFANIO VILLANUEVA were disbursed by CCA's bank.

8

Records show that, through these five checks, CCA's bank disbursed approximately $7,500 to CW1, approximately $1,500 to CW2, approximately $7,500 to defendant ROBERT VILLANUEVA, and approximately $7,500 to defendant EPIFANIO VILLANUEVA.

12. Banking records show that in or about March 2004, a $45,000 check issued by Starrett City and made payable to CCB was deposited into CCB's bank account. Records also show that, several days after this Starrett City check was deposited into CCB's bank account, approximately eight checks signed by CCB and made payable to CW1, CW2, defendant ROBERT VILLANUEVA and defendant EPIFANIO VILLANUEVA were disbursed by CCB's bank. Records show that, through these eight checks, CCB's bank disbursed approximately $15,000 to CW1, approximately $2,000 to CW2, approximately $11,200 to defendant ROBERT VILLANUEVA, and approximately $15,000 to defendant EPIFANIO VILLANUEVA.

13. Banking records show that in or about April 2004, a $50,000 check issued by Starrett City and made payable to CCC was deposited into CCC's bank account. Records also show that, several days after this Starrett City check was deposited into CCC's bank account, approximately seven checks signed by CCC and made payable to CW1, CW2, defendant ROBERT VILLANUEVA and defendant EPIFANIO VILLANUEVA were disbursed by CCC's bank. Records show that, through these seven checks, CCB's bank disbursed approximately $17,000 to CW1, approximately $5,000 to

9

CW2, approximately $10,000 to defendant ROBERT VILLANUEVA, and approximately $17,000 to defendant EPIFANIO VILLANUEVA.[2]

14.  In or about February 2006, Special Agent Fracassini interviewed cooperating witness 3 ("CW3"). CW3 stated, in sum and in substance, that the defendant EPIFANIO VILLANUEVA had approached him/her with a plan that would enable him/her to make $10,000 by depositing checks. CW3 stated, in sum and in substance, that in accordance with this plan, he/she opened a bank account. CW3 stated, in sum and in substance, that the defendant EPIFANIO VILLANUEVA then gave CW3 a Starrett City check for $45,000 made payable to CW3, which he/she endorsed and deposited in his/her account. CW3 stated, in sum and in substance that, he/she later wrote several checks made payable to CW1 and the defendant EPIFANIO VILLANUEVA.

15.  Banking records corroborate CW3's statements. Banking records show that in or about August 2003, a $45,000 check issued by Starrett City and made payable to CW3 was deposited into CW3's bank account. Records also show that, several days after this Starrett City check was deposited into CW3's bank account, approximately six checks signed by CW3 and made payable to CW1 and defendant EPIFANIO VILLANUEVA were disbursed by CW3's bank. Records show that, through these six

---

[2] One of the checks was made payable to VBIG Inc., which is a company that is owned or controlled by defendant ROBERT VILLANUEVA.

10

checks, CW3's bank disbursed approximately $17,000 to CW1 and approximately $18,000 to defendant EPIFANIO VILLANUEVA.

16. A review of bank records shows that, between April 2003 and May 2004, at least 15 other settlement claim checks were issued by Starrett City where the check was deposited into a bank account and -- similar to CW2, CW3, CCA, CCB, and CCC -- shortly thereafter, the account holder wrote checks payable to CW1, defendant ROBERT VILLANUEVA and defendant EPIFANIO VILLANUEVA. The sum of the checks made payable to CW1, defendant ROBERT VILLANUEVA and defendant EPIFANIO VILLANUEVA was almost equal to the amount of the deposited Starrett City checks.[3]

WHEREFORE, your deponent respectfully requests that arrest warrants be issued for the defendants ROBERT VILLANUEVA and EPIFANIO VILLANUEVA so that they may be dealt with according to law.

Marcus Wilson
Special Agent
Federal Bureau of Investigation

Sworn to before me this
___ day of April, 2007

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

---

[3] In many instances, there were substantial cash withdrawals following the deposit of a fraudulent check. I believe based on my experience and training, that the cash was likely given to CW1 and/or the defendants ROBERT VILLANUEVA or EPIFANIO VILLANUEVA.